IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

Consumer Financial Protection Bureau;
and State of Georgia ex rel. Christopher
M. Carr, Attorney General of the State
of Georgia,

    *Plaintiffs*,                                                    Case No.

              v.

Burlington Financial Group, LLC;
Richard W. Burnham; Sang Yi; and
Katherine Ray Burnham,

    *Defendants.*

## COMPLAINT

The Consumer Financial Protection Bureau (Bureau) brings this action against Burlington Financial Group, LLC (Burlington), Richard W. Burnham, Sang Yi, and Katherine Ray Burnham (collectively, Defendants) for (1) deceptive and abusive telemarketing acts or practices that violate the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108, and the Telemarketing Sales Rule (TSR), 16 C.F.R. §§ 310.3, 310.4, and (2) deceptive acts or practices that violate the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536. The State of Georgia, by and through its Attorney General, Christopher M. Carr, brings this action against Defendants under

Georgia's Fair Business Practices Act (FBPA), O.C.G.A. §§10-1-390 through 10-1-408. The Bureau and the State of Georgia seek permanent injunctive relief, monetary relief by way of civil penalties, restitution to persons adversely affected by the actions complained of herein, and other relief as the Court deems just and equitable, including the disgorgement of ill-gotten monies.

## INTRODUCTION

1.    Targeting financially vulnerable consumers, Defendants used telemarketing to solicit consumers with false promises that Burlington's services would eliminate credit-card debts and improve credit scores. Burlington collected millions of dollars in advance fees, claiming that it provided a "debt validation" program that used the debt-verification process set forth in the Fair Debt Collection Practices Act (FDCPA) to invalidate and eliminate debt and improve consumers' credit record, history, or rating. Burlington's so-called debt-validation program constituted financial-advisory services under the CFPA and debt-relief services under the TSR, and Burlington routinely violated both laws. Burlington misled consumers about the results its program would achieve, often leaving its customers with increased debts, impaired credit scores, and, in some instances, exposed to creditor lawsuits and bankruptcy.

## JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction over this action because it concerns federal consumer-financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

3.     This Court has supplemental jurisdiction over the State of Georgia's claims for violation of the FBPA under 28 U.S.C. § 1367(a) because those claims are so related to the claims brought under federal law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought under 12 U.S.C. §§ 5531 and 5536.

4.     Venue is proper in this district because Defendants are located, reside, or do business in this district, 12 U.S.C. § 5564(f) and 15 U.S.C. § 6103(e), and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, 28 U.S.C. §1391(b)(1), (b)(2), (b)(3), and (d).

## PARTIES

5.     The Bureau is an independent agency of the United States. 12 U.S.C. § 5491. The Bureau is charged with enforcing "Federal consumer financial laws." 12 U.S.C. §§ 5563 and 5564. The Bureau has independent litigating authority, 12 U.S.C. §§ 5564(a)-(b), including the authority to enforce the TSR with respect to

the offering or provision of a consumer-financial product or service under the

CFPA, 15 U.S.C. § 6105(d).

6.    The State of Georgia is one of fifty sovereign states of the United

States. Christopher M. Carr is the duly elected and qualified Attorney General

acting for the State of Georgia and is authorized to enforce the FBPA. The State of

Georgia, by and through the Attorney General, Christopher M. Carr, is authorized

to initiate federal district court proceedings to implement the provisions of the

FBPA and to secure such relief as the court deems just and equitable, including,

but not limited to injunctive relief, disgorgement, civil penalties, and restitution.

O.C.G.A. §§ 10-1-390—10-1-408.

7.    Defendant Burlington is a limited-liability company that was

incorporated in Maryland in 2015 and began operating in 2016. Its principal place

of business is, or was, located in Towson, Maryland. Through telemarketing and

telephone sales, Burlington offered and purported to provide debt-relief and credit-

repair services to consumers throughout the United States, including consumers in

the State of Georgia.

8.    Burlington is a "covered person" under the CFPA because it offered

or provided consumer-financial products or services, specifically "financial

advisory services," including debt-management, debt-settlement, debt-relief, and

4

credit-repair services, for use by consumers primarily for personal, family, or household purposes. 12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(viii).

9.    Burlington engaged "consumer transactions" in "trade" or "commerce" in Georgia, and it is therefore subject to the FBPA. O.C.G.A. §§ 10-1-392(a)(10) and (a)(28) and 10-1-393(a).

10.    Burlington is a "telemarketer" under the TSR, as well as the O.C.G.A. § 10-1-393.5, because, in connection with telemarketing, it initiated and received telephone calls from customers, and Burlington is a "seller" under the TSR because, in connection with a telemarketing transaction, it provided or offered to provide services to its customers in exchange for consideration. 16 C.F.R. § 310.2(dd), (ff). Burlington engaged in "telemarketing" because it made outbound telephone calls to consumers and received inbound telephone calls from consumers—calls that consumers made in response to advertising placed by or on behalf of Burlington—to induce those consumers to purchase its debt-relief and credit-repair services, and at least one of those was an interstate phone call. 16 C.F.R. § 310.2(gg). Burlington provided "debt relief services" under the TSR because it represented that it would alter, renegotiate, settle, or reduce the terms of payment for consumers' credit-card debts. 16 C.F.R. § 310.2(o).

11.    Defendant Richard Burnham is a resident of Maryland and, at all times relevant to this Complaint, he formulated, directed, controlled, had the

5

authority to control, or participated in the acts and practices set forth in this Complaint because he was an employee, consultant, officer, or de facto officer of Burlington. Mr. Burnham is a "related person" and a "covered person" under the CFPA. Mr. Burnham is a "related person" because he had managerial responsibility for Burlington, worked as a consultant for Burlington, and materially participated in the conduct and affairs of Burlington. 12 U.S.C. § 5481(25)(C)(i)-(ii). As a "related person," Mr. Burnham is deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B). In addition, Mr. Burnham knowingly or recklessly provided substantial assistance to Burlington, a covered person, in connection with its violations of the CFPA. 12 U.S.C. § 5536(a)(3). Among other things, Mr. Burnham developed Burlington's business model, consulted on its marketing and sales practices, and participated in its operation.

12.    Mr. Burnham is a "seller" under the TSR because he arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd). He also provided substantial assistance or support to Burlington because he knew or consciously avoided knowing that it was engaged in acts or practices that violated §§ 310.3(a) and 310.4 of the TSR. 16 C.F.R. § 310.3(b).

13.    Defendant Sang Yi is a resident of Maryland and, at all times relevant to this Complaint, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint because he was

6

an owner, officer, or employee of Burlington. Mr. Yi is a "related person" and a "covered person" under the CFPA. Mr. Yi is a "related person" because he was an officer and owner of Burlington and had managerial responsibility for Burlington, and he materially participated in its affairs. 12 U.S.C. § 5481(25)(C)(i)-(ii). As a "related person," Mr. Yi is deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B). In addition, Mr. Yi knowingly or recklessly provided substantial assistance to Burlington, a covered person, in connection with its violations of the CFPA. 12 U.S.C. § 5536(a)(3). Among other things, Mr. Yi was responsible for Burlington's marketing and sales practices, handled consumer complaints, and participated in Burlington's day-to-day operation.

14.    Mr. Yi is a "seller" under the TSR because he arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd). He also provided substantial assistance or support to Burlington because he knew or consciously avoided knowing that it was engaged in acts or practices that violated §§ 310.3(a) and 310.4 of the TSR. 16 C.F.R. § 310.3(b).

15.    Defendant Katherine Burnham is a resident of Maryland and, at all times relevant to this Complaint, she formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint because she was an owner, officer, or employee of Burlington. Ms. Burnham is a "related person" and a "covered person" under the CFPA. Ms.

Burnham is a "related person" because she was an officer and owner of Burlington and had managerial responsibility for Burlington, and she materially participated in its affairs. 12 U.S.C. § 5481(25)(C)(i)-(ii). As a "related person," Ms. Burnham is deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B). In addition, Ms. Burnham knowingly or recklessly provided substantial assistance to Burlington, a covered person, in connection with its violations of the CFPA. 12 U.S.C. § 5536(a)(3). Among other things, Ms. Burnham was responsible for Burlington's human resources, managed Burlington's finances, and participated in Burlington's day-to-day operation.

16.    Ms. Burnham is a "seller" under the TSR because she arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd). She also provided substantial assistance or support to Burlington because she knew or consciously avoided knowing that it was engaged in acts or practices that violated §§ 310.3(a) and 310.4 of the TSR. 16 C.F.R. § 310.3(b).

17.    Defendants provide "debt adjusting" services for purposes of O.C.G.A. § 18-5-1(1), because they provide or advertise themselves as providing to consumers debt adjustments, budget counseling, and debt management. They also advertise themselves as providing services to credit-card debtors in the management of their debts, and contract with debtors, for a fee, (1) to effect the adjustment, compromise, or the discharge of a credit-card debt, or (2) to receive

from the debtor and disburse money to his or her creditors. They do not conduct audits or maintain insurance coverage required under O.C.G.A. § 18-5-3.1.

18.    Defendants are a "credit repair services organization" under O.C.G.A. § 16-9-59, because they sell, provide, or perform or represent that they sell, provide, or perform, for a fee, services that improve a consumer's credit record, history, or rating. Defendants are not authorized to make loans or extensions of credit, are not banks or savings and loan institutions, are not 501(c)(3) non-profit organizations, and are not a credit reporting agency. Defendants are not, and do not employ, real estate brokers, persons licensed to practice law in Georgia, or broker-dealers registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission.

### FACTUAL ALLEGATIONS

19.    Promising to reduce or eliminate consumers' credit-card debts and improve consumers' credit scores, Burlington marketed and sold debt-relief and credit-repair services to consumers nationwide from January 2016 until at least September 2019, and it collected fees from consumers until at least August 2020, with at least 6,000 consumers collectively paying Burlington more than $30 million.

20.    Burlington solicited consumers primarily through in-bound telemarketing that relied on direct mailers sent via a third-party to millions of

consumers nationwide, including mailers targeting the elderly, and it also conducted out-bound telemarketing to consumers for a period.

21.    Burlington's direct-mailing campaigns utilized mailers addressed to individual consumers with each mailer prominently displaying the image of a check made out to the recipient for the amount the consumer would purportedly save by using its services:



22.    The mailers did not reference Burlington, but instead used made up names such as the "CCRP Refund Processing Center" purportedly located in Washington, D.C., and referred to fictional programs such as a "2019 Credit Card Relief Program."

23.    Burlington's mailers further stated that consumers qualified for the advertised program due to high credit-card balances and claimed that the program would reduce the amount of debt owed by the consumer as well as the amount of monthly payments for unsecured debt.

24.     For each recipient, the mailers state a specific plan number, "Debt Owed" amount, debt "Reduction Amount," and a "Pre-Approved Debt Savings" amount:

CCRP Plan Number: BF071901006

Dear ,

Please contact us immediately at **800-607-3020**. Due to your high credit card balances, our records indicate that you qualify to participate in the **2019 Credit Card Relief Program** or "**CCRP**". The CCRP plan reduces the amount you owe as well as can reduce the amount of your monthly payments on your unsecured debt.

We cannot automatically apply the CCRP plan without your authorization. Please contact us immediately at: **800-607-3020** to take advantage of the no cost consultation. Based on our initial review, below is an estimate of the **CCRP Savings** available:

**CCRP Benefits**
Recipient:
Plan Number: BF071901006
Unsecured Debt Owed: $29,000
CCRP Reduction Amount: $12,000
CCRP Pre-Approved Debt Savings: $17,000

The CCRP has limited eligibility. Please respond by **8/28/2019** to ensure your eligibility into one of our available programs. Please contact us immediately at: **800-607-3020**.

25.     In contrast to the statements on the mailer, Burlington did not know the amount of debt owed by the consumer or whether it could achieve the stated amount of debt savings.

26.     Claiming that the "CCRP" program had limited availability, Burlington's mailers instructed consumers to immediately call a toll-free number, which connected consumers to the company's call center.

27.     Through telemarketing sales agents, Burlington told consumers that it could reduce the amount of debt consumers owed and even eliminate debts

11

completely. Burlington also told consumers that it could "restore" and ostensibly improve their credit scores and remove negative items from their credit reports.

28.    Consumers who enrolled in Burlington's program received an electronic contract and were required to disclose the details of their debts—creditor names and amounts owed—and agree to a payment schedule for Burlington's services.

29.    For its services, Burlington charged consumers a percentage, typically 40%, of the debt amount owed, in the form of monthly fees. Burlington charged its customers an average of around $21,000 through monthly payments averaging about $552 per month. Burlington accepted consumer payments from consumers via electronic check. Burlington did not distribute any of this money to consumers' creditors.

30.    Burlington required consumers to make the first payment within 30 days of enrollment, and it took payments from consumers before it achieved any of the promised results.

31.    Burlington told consumers that its services consisted of a "debt validation" program that relied on the debt-verification process set forth in the FDCPA, which it claimed would invalidate and ultimately eliminate debt. But the FDCPA does not eliminate debts as Burlington claimed.

32.     In addition, many of Burlington's customers sought help with debts owed to first-party, originating creditors. The FDCPA, however, largely applies only to third-party debt collectors, rather than debts being paid to or collected by first-party creditors who originated the debt.

33.     The services that Burlington typically provided to customers consisted of talking to consumers about their debt, sending form letters and notices to creditors or debt collectors to dispute debts and demand verification of debts, sending form letters claiming that the creditors or debt collectors had not sufficiently responded to the company's demands, and deeming debts invalid or, at times, acknowledging the validity of debts. At times, the company also provided information or forms for consumers to dispute debts on their own with credit reporting agencies.

34.     Burlington often failed to deliver its promised results. Many consumers saw neither their debt reduced or eliminated nor their credit scores or reports improved.

35.     Burlington had no basis to assert that its services would result in lower or eliminated credit-card debts. Burlington did not track whether its services achieved any of these results for consumers.

36.     Burlington had no basis to assert that its services would (1) result in restored or improved credit scores or (2) remove negative items from consumers'

credit reports. Burlington did not track whether its services achieved these promised results, and it did not check consumers' credit scores or reports either before or after the company performed services for consumers. Burlington did not collect information to determine how, or to what extent, its services would impact a consumer's credit score or report.

37.    In many instances, Burlington failed to deliver results as promised, and consumers were left in a worse position than before they enrolled with Burlington, with higher debts, lower credit scores, lawsuits from creditors, and even bankruptcy.

**The Roles of Richard Burnham, Sang Yi, and Katherine Burnham**

38.    Mr. Burnham was a co-founder of and key decision maker for Burlington. He provided the initial funding for Burlington, developed its "debt-validation" program and business model, used his telemarketing and debt-relief experience and equipment to establish the company, and was responsible for or consulted on Burlington's marketing and sales practices. Mr. Burnham also leased Burlington's office space, was a signatory on bank accounts, and was responsible for the company's website, customer database, and the UPS box it used for marketing. He knew or consciously avoided knowing that the representations being made about the program's success were false or had no reasonable basis and could not be substantiated. Mr. Burnham made more than $2 million from Burlington.

39.    Mr. Yi was a co-founder, owner, and officer of Burlington. As Burlington's Chief Operating Officer, he was a key decision maker, handled day-to-day operations, and was responsible for the marketing and sales practices of the company, including training and coaching telemarketers, creating or reviewing scripts used by Burlington's telemarketers, and addressing customer complaints. He knew or consciously avoided knowing that the representations being made about the program's success were false or had no reasonable basis and could not be substantiated. As COO, Mr. Yi made more than $8 million from Burlington.

40.    Ms. Burnham was an owner and officer of Burlington. As Burlington's Chief Financial Officer, she was a key decision maker, was responsible for human resources, oversaw customer relations, and managed the company's finances, including issuing more than 1,000 refund checks to customers. Ms. Burnham also served as the signatory on many of the company's communications with consumers and creditors. She knew or consciously avoided knowing that the representations being made about the program's success were false or had no reasonable basis and could not be substantiated. As CFO, Ms. Burnham made more than $1 million from Burlington.

15

## VIOLATIONS OF THE TSR
### Asserted by the Bureau

### COUNT I
### Abusive Telemarketing Acts or Practices That Violate the TSR
### (Debt-Relief Services)

41.     The allegations in paragraphs 1 to 40 are incorporated here by

reference.

42.     It is an abusive telemarketing act or practice under the TSR for any

seller or telemarketer to request or receive payment of any fee or consideration for

any debt-relief service until and unless:

  a.     the seller or telemarketer has renegotiated, settled, reduced, or

otherwise altered the terms of at least one debt pursuant to a settlement

agreement, debt management plan, or other such valid contractual

agreement executed by the customer;

  b.     the customer has made at least one payment pursuant to that

settlement agreement, debt-management plan, or other valid contractual

agreement between the customer and the creditor or debt collector; and

  c.     to the extent that debts enrolled in a service are renegotiated,

settled, reduced, or otherwise altered individually, the fee or

consideration either (1) bears the same proportional relationship to the

total fee for renegotiating, settling, reducing, or altering the terms of the

entire debt balance as the individual debt amount bears to the entire debt

16

amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. 16 C.F.R. § 310.4(a)(5)(i).

43.    Burlington engaged in telemarketing as both a telemarketer and a seller under the TSR. 16 C.F.R. § 310.2(dd), (ff), (gg). It also provided "debt relief services" under the TSR. 16 C.F.R. § 310.2(o). Defendants Richard Burnham, Sang Yi, and Katherine Burnham are also sellers under the TSR because they arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd).

44.    In numerous instances, in connection with telemarketing debt-relief services, Burlington requested and received payment of a fee or consideration for a debt-relief service before they renegotiated, settled, reduced, or otherwise altered the terms of at least one debt under a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer and the customer made at least one payment under that agreement. 16 C.F.R. § 310.4(a)(5)(i).

45.    In numerous instances, Burlington's fee or consideration was not proportional with respect to the overall debt or a percentage of the amount saved as a result of its services. 16 C.F.R. § 310.4(a)(5)(i).

46.    Defendants, therefore, engaged in abusive telemarketing acts or practices that violated the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT II
**Abusive Telemarketing Acts or Practices That Violate the TSR
(Credit-Repair Services)**

47.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

48.    It is an abusive telemarketing act or practice under the TSR for any seller or telemarketer to request or receive payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

a.    the timeframe in which the seller has represented that all the goods or services will be provided to that person has expired; and

b.    the seller has provided the person with documentation in the form of a consumer report from a consumer-reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. 16 C.F.R. § 310.4(a)(2).

49.    Burlington engaged in telemarketing as both a telemarketer and a seller under the TSR. 16 C.F.R. § 310.2(dd), (ff), (gg). Defendants Richard Burnham, Sang Yi, and Katherine Burnham are also sellers under the TSR because

they arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd).

50.    Defendants made representations to consumers that Burlington's services would remove derogatory information from, or improve, consumers' credit histories, credit reports, or credit ratings.

51.    Burlington routinely requested and received payment of a fee or consideration for its credit-repair services before: (1) the timeframe in which it represented that all of its goods or services would be provided to the consumer expired; and (2) it provided the consumer with documentation in the form of a consumer report from a consumer-reporting agency demonstrating that the promised results were achieved, such report having been issued more than six months after the results were achieved.

52.    Defendants, therefore, engaged in abusive telemarketing acts or practices that violated the TSR, 16 C.F.R. § 310.4(a)(2).

## COUNT III
### Deceptive Telemarketing Acts or Practices That Violate the TSR

53.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

54.    It is a deceptive telemarketing act or practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the performance,

efficacy, nature, or central characteristics of its services. 16 C.F.R.

§ 310.3(a)(2)(iii).

55.     It is also a deceptive marketing practice under the TSR for a seller or telemarketer of a debt-relief service to misrepresent any material aspect of any debt-relief service, including: (1) the percentage of the debt amount that a customer may save through the service, (2) the effect of the service on collection efforts of the customer's creditors or debt collectors, and (3) the effect of the service on a customer's creditworthiness. 16 C.F.R. § 310.3(a)(2)(x). And, when making representations, a seller or telemarketer must have a reasonable basis to substantiate its claims. 16 C.F.R. § 310.3(a)(2)(x); Telemarketing Sales Rule, Statement of Basis and Purpose, 75 Fed. Reg. 48,458, 48,500-501 (Aug. 10, 2010).

56.     Burlington engaged in telemarketing as both a telemarketer and a seller under the TSR. 16 C.F.R. § 310.2(dd), (ff), (gg). It also provided "debt relief services" under the TSR. 16 C.F.R. § 310.2(o). Defendants Richard Burnham, Sang Yi, and Katherine Burnham are also sellers under the TSR because they arranged for Burlington to provide its services through telemarketing. 16 C.F.R. § 310.2(dd).

57.     In numerous instances, in connection with telemarketing their services, Burlington misrepresented, directly or indirectly, expressly or by

implication, material aspects of the debt-relief services that it offered, sold, or provided to consumers, including that its services would result in:

      a.    reduced or eliminated credit card debts;

      b.    lower monthly credit card payments;

      c.    restored or improved credit scores; and

      d.    the removal of negative items from consumers' credit reports.

58.    Likewise, Burlington misrepresented material aspects of its debt-relief service, including (1) the percentage of the debt amount that customers may save through the service, notably 100%, (2) the effect of the service on collection efforts of customers' creditors or debt collectors, notably that customers' credit-card debts would be invalidated, eliminated, and could not be collected, and (3) the effect of the service on customers' creditworthiness, notably that customers' credit scores were be restored or improved and negative credit lines removed.

59.    But, in numerous instances, Burlington's actions did not result in the reduction or elimination of consumers' credit card debts and did not restore or improve consumers' credit scores or reports.

60.    Accordingly, Burlington's representations to consumers were false—Burlington rarely if ever achieved the promised results and, in some instances, did not provide the promised services at all.

61.     Burlington's representations to consumers were unsubstantiated—Burlington did not track its results and had no way of knowing whether it achieved the promised results.

62.     Burlington's representations to consumers are material because they are directly related to the services that Burlington offered—debt relief and credit repair—and the outcomes that consumers paid Burlington to achieve.

63.     Defendants, therefore, engaged in deceptive telemarketing acts or practices that violated the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (x).

## COUNT IV
## Assisting and Facilitating Violations of the TSR

64.     The allegations in paragraphs 1 to 40 are incorporated here by reference.

65.     It is a deceptive telemarketing act or practice and a violation of the TSR for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of the TSR. 16 C.F.R. § 310.4(b).

66.     Burlington engaged in telemarketing as both a telemarketer and a seller under the TSR. 16 C.F.R. § 310.2(dd), (ff), (gg).

22

67.    In numerous instances, Burlington violated the TSR by taking prohibited advance fees for debt-relief and credit-repair services and by engaging in deception. 16 C.F.R. § 310.3(a)(2)(iii) and (x), 310.4(a)(2), (a)(5)(i).

68.    Defendants Richard Burnham, Sang Yi, and Katherine Burnham provided substantial assistance or support to Burlington because they established, operated, or managed Burlington and controlled its business practices, finances, and marketing and advertising.

69.    Defendants Richard Burnham, Sang Yi, and Katherine Burnham knew or consciously avoided knowing that Burlington took up-front fees from consumers for debt-relief and credit-repair services before it achieved any results and engaged in deception because they controlled when the company took money from consumers, handled or were aware of consumer complaints, and were responsible for or had the ability to control representations that the company made to consumers. Therefore, they were responsible for the company taking advance fees from consumers and making representations to consumers that were false or could not be substantiated.

70.    Defendants Richard Burnham, Sang Yi, and Katherine Burnham, therefore, engaged in deception under the TSR by providing substantial assistance or support to Burlington while they knew or consciously avoided knowing that

Burlington had engaged in an act or practice that violated the TSR. 16 C.F.R.

§ 310.3(b).

## VIOLATIONS OF THE CFPA
### Asserted by the Bureau

### COUNT V
### TSR Violations Constitute Violations of the CFPA

71.     The allegations in paragraphs 1 to 40 are incorporated here by

reference.

72.     Under the CFPA, it is unlawful for any covered person or service

provider to commit any act or omission that violates a "Federal consumer financial

law." 12 U.S.C. § 5536(a)(1)(A).

73.     Each of the Defendants is a covered person under, and therefore

subject to, the CFPA. 12 U.S.C. § 5481(6)(A), (25)(B), (25)(C)(i)-(ii).

74.     A violation of the TSR that is committed by a person subject to the

CFPA shall be treated as a violation of a rule under § 1031 of the CFPA, 12 U.S.C.

§ 5531, regarding unfair, deceptive, or abusive acts or practices. 15 U.S.C.

§ 6102(c)(2).

75.     Therefore, a violation of the TSR by a covered person is also a

violation of the CFPA.

76.     Because Defendants are covered persons and have committed acts or omissions that violate the TSR, they also violated the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT VI
## Deceptive Acts or Practices That Violate the CFPA

77.     The allegations in paragraphs 1 to 40 are incorporated here by reference.

78.     Under the CFPA, it is unlawful for any covered person or service provider to engage in a deceptive act or practice in connection with any transaction for or the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

79.     Burlington is a "covered person" under the CFPA and it offered a consumer-financial product or service, specifically debt-relief and credit-repair services, which are "financial advisory services." 12 U.S.C. § 5481(5)(A), (6)(A), (15)(A)(viii). Because they had managerial responsibility for, or acted as a consultant to, and materially participated in the conduct and affairs of Burlington, Richard Burnham, Sang Yi, and Katherine Burnham are "related persons" to Burlington and thus they are also "covered persons." 12 U.S.C. § 5481(25)(B), (C)(i)-(ii).

80.    An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances.

81.    In numerous instances, in connection with the offering or provision of debt-relief and credit-repair services, Defendants represented, directly or indirectly, expressly or by implication, to consumers that Burlington's services would result in:

      a.    reduced or eliminated credit-card debts;

      b.    lower monthly credit-card payments;

      c.    restored or improved credit scores; and

      d.    the removal of negative items from consumers' credit reports.

82.    These representations are material because they are the main services that Burlington offered—debt relief and credit repair—and describe the outcomes that consumers paid Burlington to pursue. Moreover, these representations likely affected consumers' decisions to enroll in Burlington's program and pay Burlington for its services.

83.    These representations were false or misleading—Burlington rarely if ever achieved the promised results and, in some instances, did not provide the promised services at all.

84.    These representations were also unsubstantiated—Burlington did not track its results and had no way of knowing whether it achieved the promised results.

85.    Consumers would be reasonable to rely on Burlington's express representations about the results its services would achieve.

86.    Defendants, therefore, engaged in deceptive acts or practices that violated the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT VII
### Substantially Assisting Violations of the CFPA

87.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

88.    Under the CFPA it is unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person violating the CFPA by engaging in deception, unfairness, or abusiveness, and the person providing substantial assistance is deemed to be in violation of the CFPA to the same extent as the covered person. 12 U.S.C. §§ 5536(a)(3), 5531.

89.    Burlington is a "covered person" under the CFPA and in numerous instances it violated the CFPA by engaging in deception. 12 U.S.C. §§ 5481(5)(A), (6)(A), (15)(A)(viii), 5531(a), 5536(a)(1).

90.    Defendants Richard Burnham, Sang Yi, and Katherine Burnham knowingly or recklessly provide substantial assistance to Burlington in connection

27

with Burlington's violations because they established and operated Burlington, managed the company, made decisions for the company and devised its business practices, were aware of or handled consumer complaints, controlled the representations that the company made to consumers, or were responsible for the company making representations to consumers that were false, misleading, or unsubstantiated.

91.    Therefore, Defendants Richard Burnham, Sang Yi, and Katherine Burnham substantially assisted Burlington's deceptive acts or practices in violation of the CFPA. 12 U.S.C. § 5536(a)(3).

**VIOLATIONS OF THE FBPA**
**Asserted by the State of Georgia**

**COUNT VIII**
**Deceptive Mailers**

92.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

93.    Defendants have engaged in unlawful, unfair, or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce, by mailing letters to Georgia residents the purpose of which was to induce those consumers to call Burlington and purchase purported "Credit Card Relief Program" or "CCRP" services, which the mailers advertised would

result in savings on credit-card balances. Those mailers are deceptive because, among other things they:

      a.    identify Burlington as "CCRP Refund Processing Center" or "CCRP Processing," which are nonexistent entities or centers;

      b.    use a Washington, D.C. return address, giving the impression that Burlington is located in Washington, D.C., when it was headquartered in and operated out of Maryland;

      c.    state that the CCRP plan "reduces the amount that [the consumer] owe[s] as well as can reduce the amount of [the consumer's] monthly payments on [his or her] unsecured debt," but Defendants do not track those amounts in their records and thus cannot substantiate that those statements are true;

      d.    specify an amount of "unsecured debt owed" by the consumer that is entirely fabricated;

      e.    specify a "Reduction Amount" that is entirely fabricated; and

      f.    specify a "Pre-Approved Debt Savings" amount that is entirely fabricated.

94.    This conduct violates:

      a.    O.C.G.A. § 10-1-393(a), which prohibits unfair and deceptive acts and practices;

b.     O.C.G.A. § 10-1-393(b)(1), which prohibits passing off services as those of another;

c.     O.C.G.A. § 10-1-393(b)(2), which prohibits causing actual confusion or actual misunderstanding as to the source of one's services;

d.     O.C.G.A. § 10-1-393(b)(2), which prohibits causing actual confusion or actual misunderstanding as to affiliation, connection, or association with another;

e.     O.C.G.A. § 10-1-393(b)(4), which prohibits using deceptive representations or designations of geographic origin in connection with services;

f.     O.C.G.A. § 10-1-393(b)(5), which prohibits representing that services have characteristics, uses, and/or benefits that they do not have; and

g.     O.C.G.A. § 10-1-393(b)(9), which prohibits advertising services with the intent not to provide them as advertised.

## COUNT IX
### Advertising or Selling Debt Adjusting Services

95.     The allegations in paragraphs 1 to 40 are incorporated here by reference.

96.     Defendants have engaged in unlawful, unfair, or deceptive business acts or practices in the conduct of consumer transactions and consumer acts or

practices in trade or commerce, by advertising or selling "debt adjusting" services, as defined by OC.G.A. § 18-5-1(1), to Georgia residents and requiring a charge, fee, contribution, or combination thereof in an amount in excess of 7.5% of the amount that consumers paid to Defendants monthly for distribution to their creditors. Defendants are prohibited by O.C.G.A. § 18-5-2 from doing so.

97.    This conduct violates O.C.G.A. § 10-1-393(a), which prohibits unfair and deceptive acts or practices.

## COUNT X
## Advertising, Selling, Providing, or Performing Credit Repair Services

98.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

99.    Defendants have engaged in unlawful, unfair, or deceptive business acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce, by:

a.    selling providing, or performing, or representing that they can or will sell, provide, or perform, in return for the payment of money or other valuable consideration, services that will improve a buyer's credit record, history, or rating, when Defendants are prohibited by O.C.G.A. § 16-9-59(a)(2)(A) from doing so;

b.    failing to provide the disclosures required by 15 U.S.C. § 1679c(a) before the consumer executes a contract with Burlington, and

failing to include the bold-face cancellation rights disclosure required by 15 U.S.C. § 1679d(b)(4) in Burlington's contracts with consumers;

c.    requesting or receiving payment of a fee or consideration for Burlington's services before the time frame in which Defendants have represented that those services will be provided has expired, as required by 15 U.S.C. § 1679b(b);

d.    representing that Burlington's "credit restoration team" "invalidates [the consumer's] accounts by, disputing [the consumer's] accounts down to a 0 balance, having them written off, charged off, and then deleted totally from [the consumer's] credit reports which will restore [the consumer's] credit score back to its original state[,]" when they have not tracked consumer credit score information in their records and thus cannot substantiate that the statement is true; and

e.    representing that, although the consumer's credit score will drop initially due to accounts entering collection status, "[o]nce the accounts enter the credit restoration stage [the consumer's] score will be restored[,]" when (i) they have not tracked consumer credit score information in their records and thus cannot substantiate that the statement is true, and (ii) this statement does not disclose the potentially

32

irreparable negative impact to the consumer's credit score if his or her debt is not invalidated.

100.    This conduct violates O.C.G.A. § 10-1-393(a), which prohibits unfair and deceptive acts or practices.

## COUNT XI
## Fraudulent or Deceptive Telemarketing and Use of a Computer or Computer Network

101.    The allegations in paragraphs 1 to 40 are incorporated here by reference.

102.    Defendants utilize officers, representatives, agents, servants, or employees who engage in activity involving telemarketing and/or using a computer or computer network, as enumerated in O.C.G.A. § 10-1-393.5(b).

103.    Defendants have unlawfully, while engaging in activity involving or using telemarketing or a computer or computer network, conducted the acts and practices described in Counts I-XI.

104.    This conduct is a device, scheme, or artifice to defraud a person, and thus violates O.C.G.A. § 10-1-393.5(b)(1). This conduct also is an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person, and thus violates O.C.G.A. § 10-1-393.5(b)(2).

## DEMAND FOR RELIEF

The Bureau, as permitted by 12 U.S.C. § 5565, and the State of Georgia, under Georgia Code Sections 10-1-397 and 10-1-397.1, and as authorized by this Court's equitable powers, requests that the Court:

a.    impose appropriate injunctive relief against Defendants for their violations of the TSR, the CFPA, and the FBPA;

b.    grant additional injunctive relief as the Court deems just and proper, including the rescission of contracts;

c.    award monetary relief against Defendants, including the refund of monies paid, restitution, disgorgement of ill-gotten gains, or compensation for unjust enrichment;

d.    impose civil money penalties against Defendants; and

e.    award the costs of bringing this action, as well as such other and additional relief as the Court determines to be just and proper.

Dated: June 25, 2021                   Respectfully submitted,

                                       CARA PETERSEN
                                            *Acting Enforcement Director*
                                       JEFFREY PAUL EHRLICH
                                            *Deputy Enforcement Director*
                                       KARA K. MILLER
                                            *Assistant Litigation Deputy*

                                       /s/ Carmen Christopher
                                       CARMEN L. CHRISTOPHER
                                            (CA Bar No. 231508)
                                            Senior Litigation Counsel
                                            Telephone: (202) 754-0329
                                            carmen.christopher@cfpb.gov
                                       NELLE ROHLICH
                                            (WI Bar No. 1047522)
                                            Senior Litigation Counsel
                                            Telephone: (202) 435-7280
                                            nelle.rohlich@cfpb.gov
                                       Consumer Financial Protection Bureau
                                            1700 G Street, NW
                                            Washington D.C. 20552


                                       CHRISTOPHER M. CARR
                                            *Attorney General*
                                       ANNE S. INFINGER
                                            *Deputy Attorney General*
                                            *Consumer Protection*

                                       /s/ Melissa M. Devine
                                       MELISSA M. DEVINE
                                            (GA Bar No. 403670)
                                            Assistant Attorney General
                                            Telephone: (404) 458-3765
                                            mdevine@law.ga.gov